KAREN MATTESON (Cal. Bar No. 102103)
Email: mattesonk@sec.gov
CAROL W. LALLY (Cal. Bar No. 226392)
Email: lallyc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Lorraine Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:14-cv-06865 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| JUSTIN MOONGYU LEE; REBECCA TAEWON LEE; THOMAS EDWARD KENT; AMERICAN IMMIGRANT INVESTMENT FUND I, LLC; BIOFUEL VENTURE IV, LLC; BIOFUEL VENTURE V, LLC; NEXLAND, INC., dba NEXLAND INVESTMENT GROUP; and NEXSUN ETHANOL, LLC, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b),

20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).  Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

2.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because at all relevant times each of the individual defendants resided in this district, the entity defendants were headquartered in this district, and certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

3.     This case involves a scheme perpetrated by two immigration attorneys, Defendant Justin Moongyu Lee ("J. Lee") and his law partner Defendant Thomas Edward Kent ("Kent"), as well as J. Lee's spouse, Defendant Rebecca Taewon Lee ("R. Lee").  J. Lee, Kent and R. Lee defrauded Chinese and Korean investors by claiming that their monies would be invested in a program that met the requirements of the United States Government EB-5 visa program, which is administered by the United States Citizenship and Immigration Service ("USCIS"), and provides immigrant investors conditional permanent residency status for a two-year period, followed by permanent residency if the required program conditions are met.  Specifically, the Defendants represented that the offered investment was EB-5 eligible, and money raised would be used to build and operate an ethanol production plant in Kansas.

4.     Under the EB-5 program, an immigrant who invests capital in a "commercial enterprise" in the United States may petition USCIS and receive

conditional permanent residency status for a two-year period.  The immigrant must invest at least $500,000 in a "Targeted Employment Area" ("TEA") and thereby create at least ten full-time jobs for United States workers.  If the immigrant satisfies these and other conditions within the two-year period, the immigrant may then petition the USCIS for permanent residency.

5.     To facilitate investment and job creation within a TEA, the EB-5 program allows entities to apply to USCIS to become approved "regional centers."  To become a regional center, the entity must demonstrate, with supporting economic and statistical studies, how it will promote economic growth, including job creation.  In this case, as explained below, J. Lee and Kent applied to USCIS in 2006 on behalf of Kansas Biofuel Regional Center, LLC, for designation of Kansas Biofuel as a "regional center."  Among other representations, J. Lee and Kent claimed to USCIS that there would be "substantial economic benefit" to the area stemming from construction and operation of new ethanol plants, including "thousands" of new jobs.

6.     From March 2009 to April 2011, the Defendants raised $11,455,000 from twenty-four investors through three offerings, purportedly for Defendant Nexsun Ethanol, LLC to construct an ethanol plant in Kansas.  Rather than investing the monies as promised – and as required for the investors to obtain residency – the Defendants misappropriated at least $7,210,000, or 62.94%, of the total amount raised.  Among other misuses, the Defendants misappropriated $3,895,000, over one-third of the investors' monies, and misused these monies to finance an unrelated project in the Philippines to extract iron ore from sand; and misappropriated and misused an additional $2,380,000 of investors' monies to refund principal to investors in other offerings.  The EB-5 eligible ethanol production plant in Kansas the Defendants represented the investors' funds would be used to build was, in fact, never built.  J. Lee, Kent and R. Lee carried out this fraud through a number of entities, which are also named as Defendants.

7.     By engaging in this conduct, the Defendants violated the antifraud

provisions of Sections 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. 240.10b-5(a) & 240.10b-5(c), and J. Lee, Kent and the entity Defendants additionally violated Exchange Act Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), with J. Lee alternatively violating Rule 10b-5 as a control person of each of the entity Defendants.

## THE DEFENDANTS

8.  **Justin Moongyu Lee ("J. Lee")**, a Los Angeles resident, was at all relevant times an attorney and member of the California State Bar until he was suspended on July 1, 2014, for failure to pay bar membership fees while disciplinary charges relating to the fraud alleged in this Complaint were pending against him.  At all relevant times, he maintained the Law Offices of Lee & Kent with Defendant Kent, in Los Angeles, California, and also held himself out to USCIS, to Kent and to investors, as a certified public accountant.  J. Lee founded, and was the chief executive officer ("CEO") and/or otherwise headed and controlled each of the entity Defendants.  In addition to his role as CEO for the entity Defendants, J. Lee was the president and managing member of Biofuel Venture IV, LLC ("BVIV") and Biofuel Venture V, LLC ("BVV"), the president and secretary of American Immigrant Investment Fund I, LLC ("AIIF"), the president of Nexland, Inc. dba Nexland Investment Group ("Nexland"), and the chairman of the board of directors and manager of Nexsun Ethanol, LLC ("Nexsun").  He was a signatory on all bank accounts of each of these entities.  In addition, he was the founder, president and CEO of related entity Kansas Biofuel Regional Center, LLC ("Kansas Biofuel"), and its sole owner and member.  J. Lee was at all relevant times a control person of each of the entity Defendants.

9.  **Rebecca Taewon Lee ("R. Lee")**, a Los Angeles resident, is the spouse of J. Lee.  She was the firm administrator of the Law Offices of Lee & Kent.  The accounting staff at Lee & Kent reported to R. Lee, who in turn reported to J. Lee.

Together with J. Lee, R. Lee jointly controlled each of the bank accounts of each of the entity Defendants, except for AIIF's bank accounts and one of BVIV's two accounts.  R. Lee was also co-president with J. Lee of Nexland, as well as Nexland's secretary.  Additionally, R. Lee held herself out to USCIS as Nexsun's president.

10.   **Thomas Edward Kent ("Kent")**, a resident of Granada Hills, California, was at all relevant times an attorney admitted to the California State Bar. He was disbarred effective August 30, 2014 based on his 2012 misappropriation of client funds in an unrelated matter..  At all relevant times, he was employed at the Law Offices of Lee & Kent.  He was executive vice president and general counsel of Nexsun, and served on its Board of Directors from about 2008 to 2009.  He also acted as Nexland's legal counsel from at least some time in 2010 to August 2011.

11.   **American Immigrant Investment Fund I, LLC ("AIIF")**, is a California limited liability company formed on November 24, 2009 by J. Lee, which was at all relevant times headquartered in Los Angeles, California.  In its offering materials, AIIF claimed to offer an EB-5 eligible investment that used investor proceeds to build and operate an ethanol production plant.  It also purported to assist foreign nationals with obtaining immigration benefits through the EB-5 program.  J. Lee was the CEO, president and secretary of AIIF.

12.   **Biofuel Venture IV, LLC ("BVIV")**, is a California limited liability company which was at all relevant times headquartered in Los Angeles, California. In its offering materials, BVIV claimed to offer an EB-5 eligible investment that used investor proceeds to build and operate an ethanol production plant.  It also purported to assist foreign nationals with obtaining immigration benefits through the EB-5 program.  J. Lee was the CEO, president and managing member of BVIV.

13.   **Biofuel Venture V, LLC ("BVV")**, is a California limited liability company which was at all relevant times headquartered in Los Angeles, California. In its offering materials, BVV claimed to offer an EB-5 eligible investment that used investor proceeds to build and operate an ethanol production plant.  It also purported

to assist foreign nationals with obtaining immigration benefits through the EB-5 program.  J. Lee was the CEO, president and managing member of BVV.

14.     **Nexland, Inc., dba Nexland Investment Group ("Nexland")**, is a California Corporation which was at all relevant times headquartered in Los Angeles, California.  Nexland is the managing member of AIIF, BVIV and BVV.  J. Lee is the founder, sole owner and co-president with R. Lee of Nexland.  R. Lee was also Nexland's secretary.  Nexland was incorporated by Kent at Lee's direction, and Kent acted as Nexland's legal counsel from 2010 to August 2011.

15.     **Nexsun Ethanol, LLC ("Nexsun")**, is a Kansas limited liability company which was at all relevant times headquartered in Los Angeles, California.  Nexsun was created to purportedly operate the ethanol plant in Kansas.  At all relevant times, J. Lee was Nexsun's CEO, chairman of the board and managing member.  R. Lee also held herself out as Nexsun's president.  Kent was executive vice president and general counsel of Nexsun.  Kent was also on the board of directors of Nexsun in or about 2008 through 2009.

## **RELATED ENTITY**

16.     **Kansas Biofuel Regional Center, LLC ("Kansas Biofuel")**, is a Kansas limited liability company that was at all relevant times headquartered in Los Angeles, California.  J. Lee and Kent prepared the business plan for Kansas Biofuel.  On April 17, 2007, the USCIS approved the application of Kansas Biofuel, which was also prepared by J. Lee and Kent, to become a regional center under the EB-5 program.  At all relevant times, J. Lee was the president and CEO of Kansas Biofuel; Kent was its vice president.

## **THE FRAUDULENT SCHEME**

17.     Defendants' fraudulent scheme was implemented as follows.  First, J. Lee and Kent applied to USCIS in 2006 on behalf of Kansas Biofuel for designation as a "regional center."  Among other representations, J. Lee and Kent claimed to USCIS that there would be "substantial economic benefit" to the area stemming from

construction and operation of new ethanol plants by Nexsun, including "thousands" of new jobs.

18.     Second, after USCIS approved the designation of Kansas Biofuel as a regional center, J. Lee and Kent created various companies, including entity Defendants AIIF, BVIV and BVV, through which to raise monies from immigrant investors.  The Defendants then proceeded to raise millions of dollars from immigrant investors by representing to them that their monies would be used to construct an ethanol plant in Kansas, and that this investment qualified the investors to obtain residency, and ultimately citizenship, in the United States.

19.     In fact, however, the ethanol plant was never built, no jobs were created, and Defendants J. Lee and R. Lee misappropriated and misused most of the $11.5 million raised in the offerings described in this action.  In particular, J. Lee and R. Lee spent over one-third of the money raised – almost $3.9 million – to finance an unrelated project in the Philippines to extract iron ore from sand, and another 21% of the monies raised, $2,380,000, to pay off investors in other offerings.  These misuses of investor monies were neither permissible under the EB-5 program nor disclosed to investors.

20.     To conceal their fraudulent use of funds and failure to construct the promised ethanol plant and create the jobs contemplated by the EB-5 program, J. Lee and R. Lee caused employees to be hired by Nexsun, but paid them for performing tasks unrelated to construction of the ethanol plant.  As required by USCIS, the Defendants then submitted a Form I-9 to USCIS identifying each employee hired. These forms were required to include basic information, such as the employee's name and address.  Additionally, the Defendants submitted lists of these Nexsun employees to USCIS purporting to show the required creation of jobs; J. Lee, R. Lee and Kent each signed false documents submitted to the USCIS.

///

///

**A.    Defendants J. Lee And Kent Applied For And Obtained Designation Of Kansas Biofuel As A Regional Center**

21.    On March 15, 2006, Kansas Biofuel applied to USCIS for designation as a regional center under the Immigrant Investor Program.  This area had been designated as a rural TEA by the State of Kansas, which provided a letter to USCIS verifying the area's status attached to Kansas Biofuel's application.  The application was signed by J. Lee as President and CEO of Kansas Biofuel.  Kent helped J. Lee prepare the application and write the business plan included with the application; Kent also wrote the cover letter to USCIS that was signed by J. Lee.

22.    Kansas Biofuel's application represented, among other things, that:

> As a result of the investments [by foreign nationals seeking immigration benefits] facilitated by [Kansas Biofuel], there will be substantial economic benefit to the local and domestic economies stemming from the construction and operation of new ethanol plants, including without limitation, creation of thousands of new jobs and millions of dollars of household income and increased tax revenues.

The application further identifies five "potential ethanol projects" to be constructed within the twenty-one county area.  In response to a March 8, 2007, letter request by USCIS for additional evidence supporting its application, Kansas Biofuel further represented to USCIS in a  March 21, 2007 letter signed by J. Lee, that "the actual first new commercial enterprise that will be targeted for investment through the proposed regional center will be Nexsun . . . ,"  and that Nexsun proposed to build an integrated bio-refinery in Grant County, Kansas consisting of separate ethanol and biodiesel production facilities, attaching a copy of Nexsun's purported business plan. The letter further represented that future investments in Nexsun would be made through one or more funding LLCs.

23.    On April 17, 2007, USCIS sent to J. Lee, as president and CEO of Kansas Biofuel, a letter setting forth its approval and designation of Kansas Biofuel

as a Regional Center.  The approval letter explicitly stated that the approval and designation was based upon the review and analysis by USCIS of the material provided in support of Kansas Biofuel's March 15, 2006, application and the supplemental information provided by Kansas Biofuel on March 21, 2007.  The USCIS approval letter confirmed, consistent with the application and supplemental information provided to USCIS by J. Lee, Kent and Kansas Biofuel, that the purpose of the Kansas Biofuel Regional Center was:

> to attract immigrant investor capital that is to be pooled in limited liability corporations (LLCs) that will promote economic growth through investments that focus on the development and operation of fuel grade ethanol production facilities within twenty-one (21) counties located in the southwest region of the State of Kansas.

The USCIS approval letter further stated that aliens seeking immigrant visas through the Immigrant Investor Program "may file individual petitions with USCIS for these new commercial enterprises" located within the Kansas Biofuel Regional Center area, and that the minimum capital investment threshold for any individual immigrant investment "shall not be less than $500,000."

**B.    The Defendants Defrauded Immigrant Investors Of Millions Of Dollars**

   **1.    The Defendants Raised $11,455,000, Representing That Investor Funds Would Be Used To Construct An Ethanol Plant**

24.    From March 2009 to April 2011, the Defendants raised $11,455,000 from twenty-four investors through three offerings of LLC units of the following entity Defendants:

> a.    **AIIF** ($4,740,020 from nine investors from February 2010 through April 2011);
>
> b.    **BVIV** ($2,205,000 from six investors from March 2009 through August 2010); and
>
> c.    **BVV** ($4,509,980 from nine investors from April 2010 through

January 2011).

25.     Defendants J. Lee, Kent, and the relevant issuer Defendant (AIIF, BVIV or BVV) provided offering materials to each investor consisting of: (1) a Confidential Information Memorandum which, in the case of BVIV and BVV, was signed by J. Lee on behalf of Nexland, the managing member of each of the issuers; (2) a Subscription Agreement, or in some cases involving AIIF, an Amended Subscription Agreement, signed by the investor and J. Lee as President of Nexland, the issuer's managing member, and signed by Kent as a "witness" (collectively, "Subscription Agreements"); (3) an Operating Agreement or Amended Operating Agreement between Nexland and the relevant issuer (collectively, "Operating Agreements") signed by J. Lee on behalf of Nexland as the issuer's managing member; (4) an Escrow Agreement signed by J. Lee on behalf of the issuer as its President, and by the investor and a representative of the bank which was acting as escrow agent; and (5) the December 19, 2007 business plan of Nexsun or the plan as "updated" June 2010, and the executive summary of the business plan of the relevant issuer signed by J. Lee on behalf of Nexland, each issuer's managing member.

26.     J. Lee approved all of the offering materials.  In part because most of the drafters of the documents who were employed by Lee & Kent were not native English speakers, at J. Lee's request, Kent reviewed all of the offering materials, and was thus aware of their content.

27.     As set forth below, each of the three investments in units in AIIF, BVIV and BVV, constituted securities in the form of investment contracts because each investment involved: (1) an investment of money; (2) in a common enterprise; (3) with profits to come from the efforts of others.

### a.     There Was An Investment Of Money

28.     As set forth in each issuer Defendant's Confidential Information Memorandum and Subscription Agreement, to purchase units of the issuer, the investor was required to invest $500,000, which was solely to be used to make an

income-generating investment in Nexsun (for the AIIF offering), or to acquire units of ownership in Nexsun (for the BVIV and BVV offerings).  In the case of AIIF, the total amount paid by the investor was $530,000, $500,000 of which constituted the investment, and the remaining $30,000 of which was a fee for administrative and operating expenses.  Similarly, in the case of BVV, the total amount paid by the investor was $505,000, $500,000 of which constituted the investment, and the remaining $5,000 of which was to be retained by BVV as an "administrative fee."

### b.   The Investment Was In A Common Enterprise

29.   Each issuer Defendant's Confidential Information Memorandum described the issuer as "formed to pool investment monies of foreign nationals seeking certain immigration benefits through the EB5 investment program . . ., which grants lawful permanent resident status in the United States to those who make qualifying investments under the provisions of the relevant immigration law."  Similarly, each issuer's Subscription Agreement, including AIIF's Amended Subscription Agreement, explicitly stated that the investor was remitting funds to the issuer "for the specific purpose of obtaining immigration benefits under the EB5 investment program."  Ultimately, as set forth above, during the period from March 2009 through April 2011, each offering raised several million dollars from several investors, raising a grand total of almost $11.5 million from 24 investors.

### c.   Profits Were To Be Derived From The Efforts Of Others

30.   Each issuer Defendant's Confidential Information Memorandum further provided that upon approval of the investor's I-526 petition to USCIS for residency, the issuer would utilize $500,000 of the investor's money to either, in the case of AIIF, make a loan/investment to Nexsun, "the proceeds of which will be used to for the development and construction of an ethanol production facility and ancillary businesses in Ulysses, Kansas," or, in the case of BVIV and BVV, "to acquire units of ownership of a new commercial business enterprise known as [Nexsun] … [which was established] in 2006 to develop and operate an integrated bio-fuel refinery" in

southwest Kansas.  Similarly, Nexland, through its president J. Lee, explicitly represented in each of the issuer's Subscription Agreements that "this entire [investment] amount [$500,000] will be utilized by [the issuer] for the sole and specific purpose of" in the case of AIIF, "making an income-generating investment in Nexsun," and similarly in the case of BVIV and BVV, "acquiring a membership interest in Nexsun."  Additionally, according to each issuer's Confidential Information Memorandum, the investment was represented as a "qualifying investment" under immigration law because it was: (1) for a minimum of $500,000; (2) in a Target Business in the TEA, which was at least projected to meet the minimum job creation requirements of the Program; and (3) to be subject to an undertaking from the Target Business (Nexsun) to make the best efforts to hire individuals who reside in the TEA.

31.    Each issuer's Confidential Information Memorandum and Subscription Agreement provided that in exchange for their investment, the investors would receive a return.  In the case of AIIF, investors would receive an annual dividend of up to 1% of their investment, pro-rated based on the date their investment was released to Nexsun, and semi-annual payments of interest at an annual rate of 2.5% per year, with the investment maturing in five years.  In the case of BVIV and BVV, the Confidential Information Memoranda provided that "profits and losses realized from [the issuer's] investments in Nexsun will be allocated and distributed to the members based on proportionate ownership interest in [the issuer]."

32.    Each issuer's Confidential Information Memorandum further represented that the Managing Member of the issuer would be Nexland, and that the day-to-day management of the issuer would be conducted by Nexland.  Indeed, each issuer's Confidential Information Memorandum expressly provides that "Under the provisions of the [issuer's] Operating Agreement, the members of [the issuer] may not take part in the daily management," and further that "daily management decisions, lending decisions, investment decisions, decisions regarding payment of

distributions and decisions concerning investor withdrawal are within the sole discretion of the Managing Member," Nexland.  Each issuer's Operating Agreement with Nexland contained a similar provision that "the right to exercise the powers of the [issuer] and to manage the business and daily affairs of the [issuer] is vested entirely in the Managing Member [Nexland]."  The Operating Agreements further provided that the President of the issuer – in all cases J. Lee – would be the general manager and chief executive officer of the issuer, and, subject to the control of the managing member, Nexland – of which J. Lee was also President – would have general supervision, direction and control of the issuer's business.

33.    After an investor invested, a standard package would be prepared by J. Lee and Kent and sent to USCIS as part of the investor's immigrant visa petition.  That package consisted of the offering documents, proof that the investor had paid and the source of the investor's funds to invest, and a cover letter from Kent.

34.    The investors' profits were thus to be derived from the efforts of others – the issuer Defendants through their president, J. Lee, and Defendant managing member Nexland, also controlled by J. Lee.

## 2.    Contrary To The Defendants' Representations, The Ethanol Plant Was Not Built

35.    As set forth above, the offering materials for each of the issuer Defendants represented that investors' monies would be invested in Defendant Nexsun, which was represented to have been established to develop and operate a bio-fuel refinery or ethanol production plant in southwest Kansas.  The version of the Nexsun Business Plan updated in June 2010 explicitly represented that "Major construction work is ongoing and the plant will be in operation before November 2011."  Kent also orally represented to investors that their funds would be used to build the Nexsun plant in Kansas.  Additionally, Kent was present at investor seminars from 2008 to 2010 in Los Angeles that  were set up by J. Lee and R. Lee, at which the main part of the presentation was the purported Nexsun ethanol project.  J.

Lee approved all information that was presented to potential investors at these seminars.

36.     In fact, construction was never completed on the plant.  Construction, consisting merely of preliminary work such as grading, installation of a rail spur and construction of a fire lane, ceased in or about mid-2008, well before the Nexsun business plan was "updated" in June 2010.

37.     Kent, who reviewed all of the offering materials and was thus aware that they represented that the investors' money would be used to build an ethanol plant, knew that there was no above-ground structure because there was no funding to build it, and that construction had stopped.  In particular, Kent knew the status of the construction of the plant because he was involved in preparing the contracts with the contractors, and he was on site dozens of times and saw the status of construction at the site.  Kent knew that when he left Lee & Kent in August 2011, no plant had been constructed.  He also knew that the sole source of funds for any construction at the site was investor monies, because no bank financing had ever been obtained.

38.     J. Lee knew the status of the construction of the plant because he was responsible for approving all of the expenses of the contractors.

39.     Both the December 19, 2007 and the updated June 10, 2010 Nexsun Business Plans represented that on October 15, 2007, Nexsun entered into a Plant Management Agreement with Prairie Horizon Agri-Energy, LLC ("PHAE").  The Nexsun Business Plans further represented that pursuant to the agreement, PHAE had been given a five year contract to provide plant management, risk management and marketing services to Nexsun, had made a $2.5 million at risk equity investment in Nexsun and had been given two seats on Nexsun's Board of Directors.  Nexsun's Business Plans also touted the extensive ethanol plant management experience of PHAE's CEO and General Manager, and PHAE's "proven track record for operating ethanol facilities efficiently and profitably."

40.     In fact, however, before the Nexsun Business Plan was updated in June

2010, Kent had signed a Mutual Termination of Plant Operation Agreement effective as of September 12, 2008, on behalf of Nexsun, under which Nexsun gave PHAE $2,250,000 as a full refund of its management services and investment in the ethanol project. The subsequently drafted June 2010 "updated" Nexsun Business Plan nevertheless represented that PHAE had a substantial role and investment in the project, and was disseminated to investors as late as April 2011.

41.     Kent visited the construction site frequently in 2008 and 2009, when no construction was taking place. In particular, Kent and R. Lee attended  meetings on behalf of Nexsun with the Grant County Economic Development Corporation ("GCEDC") which took place in Ulysses, Kansas on or about March 11, 2009. At the meetings at which Kent and R. Lee were present, it was discussed that the ethanol plant was not economically feasible at that point in time.

42.     In about 2011, J. Lee ordered the removal of the construction trailer from the site because he did not want to continue to pay for its rental.

43.     J. Lee and Kent nevertheless failed to stop distribution to investors of the version of the Nexsun business plan updated in June 2010, knowing that the representation that the construction was "ongoing" and that plant would be in operation before November 2011 was false because construction had ceased, and because construction of an ethanol plant was no longer economically feasible.

### 3.     The Defendants Provided USCIS Misleading Documentation Purporting To Show Job Creation By Nexsun

44.     For Kansas Biofuel to retain its USCIS EB-5 regional center status, the Defendants were required to show that Nexsun had created permanent full-time jobs. If Kansas Biofuel lost its EB-5 regional center status, investors would not be able to seek permanent resident status in exchange for investing in the Nexsun project. Because the Nexsun ethanol plant was never constructed, no such permanent full-time jobs relating to the plant were ever created.

45.     Nexsun nevertheless recruited employees. Each new employee recruited

1  by Nexsun was provided a USCIS Form I-9, Employment Eligibility Verification.

2  Either an office assistant working for the Defendants in Kansas or the employee

3  would complete Sections 1 and 2 of the form, providing the employee name, address,

4  and other personal information, and listing a type of employee identification (such as

5  a Driver's License), and the employee would sign the form. The office assistant

6  would then fax the form to Nexsun in Los Angeles for certification by R. Lee as

7  President of Nexsun.

8      46.    In 2010 and 2011, the Defendants submitted Form I-829 packages to

9  USCIS petitioning for removal of the conditions on specific investors' residency in

10  the United States. The purportedly verified I-9s, as well as the employee lists, were

11  included in the Form I-829 packages, and/or as part of responses by Nexsun to

12  USCIS Requests for Additional Evidence supporting specific I-829 petitions

13  ("RFE"). Kent wrote and signed the cover letters for the Form I-829 packages, and

14  R. Lee participated in preparation of the I-9 forms and other documentation included

15  in the packages. Kent reviewed the Form I-829 packages before they were submitted

16  to the USCIS.

17      47.    In response to Forms I-829 submitted by the Defendants, USCIS stated

18  in various 2010 and 2011 RFEs that the petitioning investor was required to provide

19  evidence of direct job creation for the operation of the ethanol plant or documented

20  proof of the completion of the ethanol plant and the hiring of qualifying employees

21  within the required two year residency period, among other evidence.

22      48.    Nexsun employee lists, including lists dated as of February 9, 2010 and

23  as of August 31, 2010, were included in submissions made by the Defendants in

24  response to USCIS RFEs. The employee lists submitted to USCIS were misleading

25  because, among other things, they were submitted well after Kent and R. Lee became

26  aware that construction of the Nexsun ethanol plant had ceased. The lists were

27  further misleading because they listed R. Lee and Kent's wife as full-time Nexsun

28  employees without disclosing they lived in California rather than in the Kansas TEA,

and the February 9 and August 31, 2010 lists described Kent's wife's position as "Accountant," when she performed at most clerical functions for Nexsun.

49.     The responses to the USCIS RFEs also included materially false and misleading letters signed by Kent and by R. Lee as president of Nexsun.  In his letters included with 2010 and 2011 RFE submissions, Kent falsely represented that either twenty-one or twenty-six "full time direct jobs" were created by Nexsun as of the date of the investor's I-829 petition, depending upon whether the included Nexsun employee list was dated as of February 9 or as of August 31, 2010.  In response to USCIS inquiries concerning the fact that the ethanol plant had not yet been built, Kent also falsely represented that:

> Despite being confronted with challenging economic conditions and
> delays beyond its control, the evidence presented demonstrates that
> construction of Nexsun's refinery is substantially underway and moving
> towards successful completion. . . .  Petitioner currently expects that
> construction will be complete and commercial operations will commence
> by the first quarter of 2012. . . .  Nexsun's hiring process is continuing as
> are its capital expenditures.  As such additional direct jobs and literally
> hundreds of indirect jobs will be created in the very near future as the
> project reaches completion.

Kent made these statements knowing that construction ceased in mid-2008 and had not resumed, and that no one on the employee list was performing tasks involving the nonexistent Nexsun ethanol plant.

50.     In her letters included with 2010 and 2011 RFE submissions, R. Lee falsely represented that "economic conditions" had made it difficult for Nexsun to raise capital, but that Nexsun still intended to construct a 40 million gallon per year fuel grade ethanol production facility in Grant County, Kansas, and had not abandoned the project.  Like Kent, R. Lee further falsely represented that "construction is substantially underway," and that Nexsun expected that construction

1  would be completed and commercial operations would commence by the first quarter

2  of 2012, when she was aware that these facts were untrue.

3      51.    No one who J. Lee and/or R. Lee caused to receive a Nexsun paycheck

4  was hired to perform any task related to any ethanol plant, because that plant never

5  existed.

6      **4.    The Defendants Misappropriated And Misused Investor Funds**

7      52.    J. Lee had ultimate authority over how the investor monies raised for the

8  Nexsun project were used.  Construction budgets were presented to J. Lee by Kent,

9  who received them from various vendors.  J. Lee would either approve the budget or

10  instruct his subordinates to make a counteroffer.  J. Lee had authority to approve

11  Nexsun's expenses; R. Lee also approved expenses, after consulting with J. Lee.  J.

12  Lee was a signatory on all bank accounts of every entity Defendant.

13      53.    R. Lee signed all checks that  were not signed by J. Lee.  R. Lee was a

14  signatory, together with J. Lee, for the bank accounts of Defendants BVV, Nexland

15  and Nexsun, and one of BVIV's two accounts.

16      54.    Kent also had knowledge of Nexsun's expenditures, as he reviewed

17  Nexsun's financial books and records to ensure Nexsun was not being overbilled on

18  the construction contracts, and those records show that payments to contractors ended

19  in December 2008.

20      55.    J. Lee and R. Lee misappropriated and misused at least $7,210,000, or

21  62.94%, of the $11,455,000 raised from investors in the AIIF, BVIV and BVV

22  offerings.  Specifically:

23          a.    J. Lee and R. Lee used $3,895,000, or 34%, of the investor funds

24              to finance a project in the Philippines to extract iron ore from

25              sand.

26          b.    J. Lee and R. Lee paid $2,380,000, or 20.78%, of the investor

27              funds to investors in other offerings who demanded their money

28              back.

c.   J. Lee and R. Lee misappropriated and misused at least an additional $760,000 by sending it to other entities they owned and controlled for purposes unrelated to the investment in AIIF, BVIV or BVV.

56.   The misuse of funds included J. Lee taking money out of investor escrow accounts without their knowledge prior to the approval of the investor's I-526 application for residency when J. Lee was running low on cash and having difficulty obtaining financing.  J. Lee did so notwithstanding he knew he was acting as a fiduciary for the investors, other attorneys in his firm advised him that he did not have the power to make such withdrawals, and the offering documents he drafted, including the Confidential Information Memoranda, Subscription Agreements and Escrow Agreements, did not allow J. Lee to make such withdrawals.  Kent was aware of this misuse of funds by J. Lee, but Kent nevertheless failed to inform investors of the misuse of their monies, and participated in making the offerings until at least April 2011.

## FIRST CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities
### Violations of Section 17(a) of the Securities Act
### (against all Defendants)

57.   The SEC realleges and incorporates by reference paragraphs 1 through 56 above.

58.   The Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

a.   with scienter, employed devices, schemes, or artifices to defraud;

b.   obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; or

    c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

59.    By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities

### Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a) and 10b-5(c) Thereunder

**(against all Defendants as primary violators, and, alternatively,**
**against J. Lee as a control person under Section 20(a) of the Exchange Act)**

60.    The SEC realleges and incorporates by reference paragraphs 1 through 56 above.

61.    The Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a.    employed devices, schemes, or artifices to defraud; or

    b.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

62.    By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

63.    Defendant J. Lee was a control person of Defendants AIIF, BVIV, BVV, Nexland and Nexsun because he possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of each of these entities.

Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a),
Defendant J. Lee is liable to the SEC to same extent as each of the entity Defendants
for those Defendants' violations of Section 10(b) and Rules 10b-5(a) and (c)
thereunder.

### THIRD CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act**

**and Rule 10b-5(b) Thereunder**

**(against Defendants J. Lee, Kent, AIIF, BVIV, BVV, Nexland and Nexsun as
primary violators, and, alternatively, against J. Lee as a control person under
Section 20(a) of the Exchange Act)**

64.    The SEC realleges and incorporates by reference paragraphs 1 through
56 above.

65.    Defendants J. Lee, Kent, AIIF, BVIV, BVV, Nexland and Nexsun, by
engaging in the conduct described above, directly or indirectly, in connection with the
purchase or sale of a security, by the use of means or instrumentalities of interstate
commerce, of the mails, or of the facilities of a national securities exchange, with
scienter, made untrue statements of a material fact or omitted to state a material fact
necessary in order to make the statements made, in the light of the circumstances
under which they were made, not misleading.

66.    By engaging in the conduct described above, Defendants J. Lee, Kent,
AIIF, BVIV, BVV, Nexland and Nexsun violated, and unless restrained and enjoined
will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and
Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

67.    Defendant J. Lee was a control person of Defendants AIIF, BVIV, BVV,
Nexland and Nexsun because he possessed, directly or indirectly, the power to direct
or cause the direction of the management and policies of each of these entities.
Accordingly, pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a),

Defendant J. Lee is liable to the SEC to same extent as each of the entity Defendants for those Defendants' violations of Section 10(b) and Rule 10b-5(b) thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### II.

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendants and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule10b-5 thereunder, 17 C.F.R. §§ 240.10b-5.

### III.

Order Defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest.

### IV.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

///

///

1

## VI.

2

   Grant such other and further relief as this Court may determine to be just and

3

necessary.

4

 Dated:  September 3, 2014

5

                                                      */s/ Karen Matteson*
                                                      _____
6                                                     Karen Matteson
                                                      Attorney for Plaintiff
7                                                     Securities and Exchange Commission

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28